IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CINDY CARILLO,

      Plaintiff,

vs.                                                     Civ. No. 00-1087 JP/RLP-ACE

STATE OF NEW MEXICO WORKER'S
COMPENSATION ADMINISTRATION,
and RICHARD CROLLET,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

On May 10, 2001 Defendants' filed a motion for summary judgment.  Doc. No. 46.  In accordance with the Court's July 3, 2001 Order, on July 11 and July 12, 2001 the parties refiled their briefs.

On June 12, 2001 Defendants filed a motion to strike the final 19 pages of Plaintiff's 43-page response to Defendants' motion for summary judgment (Doc. No. 51) because it did not comply with the page limit of D.N.M. LR-Civ. 7.7.

On June 26, 2001 Plaintiff belatedly filed a motion to exceed the page limit for response briefs.  Doc. No. 56.

Defendants' motion to strike will be denied.  Plaintiff's motion to exceed the page limit for her response brief will be granted.  Defendants' motion for summary judgment will be granted in part and denied in part.

I.       **Summary judgment process**

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c).  When

applying this standard, the factual record and reasonable inferences therefrom are examined in the light most favorable to the party opposing summary judgment.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  The party moving for summary judgment bears the burden of "'showing' --that is, pointing out to the district court-- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U. S. 317, 325 (1986).  When the moving party makes this showing, it shifts the burden to the non-movant to come forward with evidence that there is a genuine issue of material fact. Bacchus Indus. Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of the pleadings.  See id.  "[T]he nonmoving party must, at a minimum, direct the court to facts which establish a genuine issue for trial."  White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir. 1995) (emphasis in original).  Those facts must be specific, and be supported by reference to specific exhibits in the record.  Mitchell v. City of Moore, 218 F.3d 1190, 1199 (10th Cir. 2000).  It is not the task of the Court to comb the record for a party in an effort to locate support for factual allegations, although the Court has discretion to do so.  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998).  The Court is neither an advocate for one party or the other, id., nor is it a "stage director" in charge of prodding the parties through rehearsal until proper performance is achieved, Moore, 218 F.3d at 1199, (rejecting as "specious" a summary judgment response which lacked reference to specific facts and lacked citations to the record).

A summary judgment movant must set out facts, by number, as to which the movant contends no dispute exists.  D.N.M. LR-Civ. 56.1.b.  Each numbered fact must contain a citation to the record to support the stated proposition.  Id.  In response, the non-movant must provide a

concise statement of the facts as to which the non-movant believes an issue of fact exists, identifying those facts of the movant which the non-movant disputes and referring "with particularity" to those portions of the record upon which the non-movant relies to establish a dispute.  Id.  If the non-movant fails to "specifically controvert[]" the movant's purported statement of material facts, the movant's facts will be deemed admitted.  Id.

Plaintiff's amended response brief violates these rules in three general ways.  The first violation is the length of Plaintiff's brief.[1]  As Defendants point out in their motion to strike, response briefs are not to exceed 24 pages.  D.N.M. LR-Civ. 7.7.  Plaintiff's legal argument does not even begin until page 26 of her response brief.  Granting Defendants' motion to strike would thus, in effect, leave the Court no choice but to grant Defendants' motion for summary judgment on the ground that Plaintiff failed to respond to it.  D.N.M. LR-Civ. 7.5(b).  It would certainly be unjust to penalize Plaintiff for her attorneys' disregard of the local rules.  Accordingly, I will grant Plaintiff's motion to exceed the page limitation.  I will nonetheless remind Plaintiff's counsel of what should be obvious: leave of court should be sought and obtained before, not after, an excessively long brief is filed or served.

The second fundamental problem with Plaintiff's Amended Response has to do with her attorneys' casual reference to supporting evidence.  The first 24 pages of the brief are devoted to factual allegations, under one heading or another.  Plaintiff does include sections discussing Defendants' statement of facts, as contemplated by Local Rule 56.  Am. Resp. at 7-16.  Often though, the ways in which Plaintiff contends that Defendants' facts are disputed are frustratingly devoid of citations to the record.  Similarly, large portions of Plaintiff's list of undisputed facts

---

[1] Plaintiff's Amended Response superseded her first response brief, but is just as long.

lack citations to supporting evidence in the record.  Plaintiff's list of facts in dispute lacks a single evidentiary citation.  Plaintiff's factual assertions, even if true, are now irrelevant.  Her version of the facts must have support in the record, and she must point the Court to those portions of the record.

The third problem with Plaintiff's amended response has to do with its format.  Plaintiff appears to believe that she can survive a motion for summary judgment as to every claim in her multiple-count case by laying out 24 pages of facts or allegations, followed by a few citations to caselaw, without explaining exactly which facts she believes support a particular count.  Plaintiff confuses the Court's real obligation to view the facts in a light most favorable to her, with a perceived but non-existent duty of the Court to pick and choose from her several lists of facts those which the Court believes are most helpful to the various aspects of Plaintiff's case.  This is not a single-count case in which the Court could safely assume that every fact or allegation brought to its attention supports the sole claim.  Accordingly, the Court has closely scrutinized the argument portion of Plaintiff's brief, which more or less addresses each claim in each count, in an effort to glean from it those facts which Plaintiff believes support each claim.  Mainly where Plaintiff has failed to specify facts, in the argument section of her brief, on which she relies to support a given claim, the Court has, with great reluctance but in the interest of justice, exercised its discretion to comb the factual portions of Plaintiff's brief and the record in an effort to discern support for a particular claim.  However, where Plaintiff has described facts in the argument portion of her brief, the Court has assumed Plaintiff's description of pertinent facts to be exhaustive and has declined to comb the factual portions of Plaintiff's brief or the record to see of there is additional factual support.

4

## II.      Background

In 1994 Plaintiff was hired as an Ombudsman for the Worker's Compensation Administration ("WCA").  Around January 1997, the WCA Bureau Chief retired.  A string of temporary Bureau Chiefs followed.  Plaintiff served as temporary Bureau Chief from September 1997 to January 1998.  Defendant Crollet[2] was hired as a permanent replacement, effective May 1998.  Crollet is Hispanic.

Just before Crollet was hired, Plaintiff in March 1998 filed her first two internal grievances.  The first, in which she complained of sex and national origin discrimination, had to do with her objection to the appointment of a mediator to handle a worker's compensation claim she had against a previous employer.  The second, a sex, national origin, and retaliation claim, dealt with the reclassification of the Bureau Chief position making it for attorneys only.[3]

On August 25, 1998 Plaintiff filed her first internal grievance against Crollet.  She alleged that he discriminated against her when he gave her an overall rating of "meets expectations" rather than "exceeds expectations" on her Performance Appraisal Development ("PAD") form.  Plaintiff believed that this discriminated against her on the basis of her national origin and gender, and was retaliatory, because other ombudsmen, including Hispanics and women, in other field offices appraised by different supervisors received the "exceeds expectations" rating.  Her internal grievance was resolved in her favor, and her PAD was

---

[2] Plaintiff spells Crollet with one "t."  Defendant sometimes does the same but usually spells the name "Crollett."  I have adopted the spelling in the case caption of the Second Amended Complaint.

[3] The facts to this point are drawn from Facts 1-5 of Defendant's statement of material facts, to which Plaintiff "does not disagree."  Am. Resp. at 7.

changed to "exceeds expectations."[4]

On December 31, 1998 Plaintiff filed her second internal grievance against Crollet, this time alleging he had engaged in an unfair employment practice by denying her leave.  On that day, the WCA was closing at 3:00 p.m.  Plaintiff usually took lunch at 1:30 p.m. but asked that day to leave for lunch at 2:00 p.m. so that she could, in effect, go home one hour earlier.  Crollet denied her request because Joan Calcutt, a Hispanic female, had already made the same request.  Plaintiff then asked for one-half hour of leave, which request Crollet denied on the ground that she was simply trying to circumvent his earlier decision with regard to her lunch schedule that day.[5]

In the first part of 1999 the WCA hired a mediator to resolve the differences between Plaintiff and Crollet.  On March 10, 1999, before mediation was actually underway, Plaintiff filed another internal grievance against Crollet in which Plaintiff objected to guidelines (the substance of which are not provided) Crollet proposed for governing the mediation.  Plaintiff's written grievance describes Crollet's proposed mediation guidelines as retaliation "for filing a complaint against him."  Unnumbered final page of Ex. 26 to Defs' Ex. A.  In a deposition Plaintiff testified that Crollet's proposed guidelines were prompted by Plaintiff's race and

---

[4] The facts in this paragraph are drawn from Defendants' Fact 6.  Plaintiff does not purport to admit Defendants' Fact 6 in the section of her brief (part 1 of section II) in which she lists those facts to which she "does not disagree."  (Strangely, in Plaintiff's brief there is no section I.)  But, Plaintiff does not address Defendants' Fact 6 in part 2 of section II, which is her response to Defendants' facts which Plaintiff disputes.  Therefore, since Plaintiff did not specifically admit or deny Defendants' Fact 6, it is deemed admitted under D.N.M LR-Civ. 56.1.b.

[5] Plaintiff objects to the facts in this paragraph as being argumentative.  I agree and have rephrased the substantive facts--which Plaintiff does not dispute--in a more even-handed way.

gender.

Apparently, no retaliation was found, so on March 23, 1999 Plaintiff appealed to Laura Feight, Deputy Director of the WCA. Ms. Feight found that Crollet's proposed guidelines were not retaliatory. On April 12, 1999 Plaintiff appealed to Stephen Kennedy, then Director of the WCA. He concluded, "I find evidence not of retaliation but [of] constant bickering on your part and that of your supervisor, Mr. Crollet." Page 2 of Ex. 26 to Defs' Ex. A. The proposed guidelines were never adopted. At an unspecified time, Mr. Kennedy asked Crollet why he should not discharge Crollet in light of Plaintiff's complaints against Crollet. Virginia Stair, Claims Adjuster for Risk Management, testified that Barbara Pena-Johnson, Head of Personnel, was "out to get" Plaintiff. Pl's Ex. C at 21.[6]

In April 1999 Plaintiff filed another internal grievance against Crollet. This time, she alleged that Crollet breached the confidentiality of the mediation process, in unspecified ways.[7]

Ultimately, the mediation resulted in Plaintiff and Crollet resolving various issues of dispute between them, including leave policies, vacation, and lunch hours. Plaintiff was satisfied with the resolution, at least until Mr. Kennedy left in July 1999.[8] Plaintiff alleges without citation to the record that sometime before Mr. Kennedy left, he fired Crollet. Am. Resp. at 19.

---

[6] The facts in this paragraph and the previous one are derived from Defendants' Fact 9 and those sentences of Plaintiff's response to Defendants' Fact 9 which are followed by citations to the record and to which Defendants have not objected.

[7] The exhibits supporting these two sentences, from Defendants' Fact 11, are not attached on the ground that Plaintiff has admitted it, in accordance with the Court's instructions. At one point, Plaintiff purports not to disagree with Fact 11, Am. Resp. at 7, but later seems to dispute it, id. at 10. Plaintiff provides no citation to the record to support her dispute. Defendants' Fact 11 is therefore deemed admitted under D.N.M. LR-Civ. 56.1.b.

[8] This paragraph derives from Defendants' Fact 12, portions of which are omitted as immaterial. Plaintiff's objections are either also immaterial or are not supported with citations.

On May 13, 1999 Plaintiff filed an EEOC charge alleging national origin discrimination and retaliation.[9]

In August 1999 Plaintiff filed another grievance against Crollet.  This time, she alleged that Crollet retaliated against her in the form of her PAD evaluation.  She later testified, "I wouldn't say the ratings were retaliation, I would say that they were just strictly unjustified." Defs' Ex. D, page 183, lines 23-24.[10]

In mid-September 1999 Plaintiff filed another grievance against Crollet.  This one alleged retaliation and harassment "concerning the process by which Plaintiff was to report bad faith claims."  Defs' Fact 19.  This complaint was resolved.[11]  At the grievance hearing, Mr. Barber, the WCA Director who replaced Mr. Kennedy, instructed Plaintiff to file her grievances directly with him, bypassing interim steps.  Plaintiff felt this was unfair.[12]  Plaintiff alleges, without pointing to any support in the record, that sometime after Mr. Barber replaced Mr. Kennedy, Mr. Barber rehired Crollet,  Am. Resp. at 19.

In February 2000 Plaintiff filed a final internal grievance with Mr. Barber.  This grievance concerned Plaintiff's allegation that she was not permitted to leave work to vote at the end of the day.  Her grievance indicates that she was given permission to vote at the time slot she

---

[9] This fact is undisputed.

[10] The facts in this paragraph derive from Defendants' Fact 19 and from the cited deposition testimony.  Incredibly, Plaintiff in her brief denies having made this statement.  She also makes other assertions which she claims show a dispute as to Defendants' Fact 19, without providing a single citation to the record.

[11] Plaintiff purports to dispute the facts concerning the mid-September 1999 grievance, described in Defendants' Fact 19, but provides no citation to the record.

[12] Plaintiff purports to dispute this fact concerning the new grievance procedure with a citation to the record that is consistent with Defendants' version of events.

requested.[13]

Later in 2000, Plaintiff left the WCA and went to work for more money at a job requiring her to commute from Albuquerque to Santa Fe.[14]

On February 26, 2001 Plaintiff filed a second amended complaint, which now controls this case.  In it, she makes a number of factual allegations, followed by five counts.  The first count is brought under Title VII for gender, race, or disability discrimination, and for creating a hostile work environment.  The second count is under 42 U.S.C. § 1983 for violations of her First Amendment right to speak freely, and her Fourteenth Amendment rights to procedural and substantive due process.  The third count is under the New Mexico Human Rights Act.  The fourth count is for breach of contract.  Plaintiff stated at the July 3, 2001 pretrial conference that she no longer intends to pursue her breach of contract claim.  The fifth count is for injunctive relief.

Although the second amended complaint contains little indication as to which factual allegations support which counts, Defendants did not seek a more definite statement.  Instead, Defendants moved for summary judgment as to every claim under every count.

## III.   Discussion

### A.      Constitutional claims

Plaintiff lumps together in Count II her constitutional claims brought under 42 U.S.C. § 1983.  Defendants argue that the Eleventh Amendment bars suits brought in federal court against state entities for damages.  While this is not true of Title VII suits against state agencies,

---

[13] Plaintiff admits this fact.

[14] The parties essentially agreed to these facts at the July 3, 2001 pretrial conference.

Fitzpatrick v. Bitzer, 427 U.S. 445, 452-56 (1976), it is true with respect to constitutional claims brought under section 1983 against state agencies or state officials sued in their official capacity for damages,  Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).  Accordingly, the WCA will be dismissed as to any claim under Count II for damages, as will Crollet to the extent he is sued in his official capacity for damages.  On the forty-second page of her brief, Plaintiff explains that she sues Crollet in his individual capacity too.  A plaintiff may pursue damages against a state officer acting in his personal capacity.  Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).  Plaintiff also seeks injunctive relief, as to which the Eleventh Amendment is not a bar.  Edelman v. Jordan, 415 U.S. 651, 677 (1974).  Accordingly, I will further examine each of Plaintiff's constitutional claims.

### 1.     First Amendment right to speak freely

Plaintiff contends that she suffered retaliation after making sex and national origin discrimination claims.  In a case such as this, Plaintiff can pursue her claim only if the speech was about a matter of public concern.  Woodward v. City of Worland, 977 F.2d 1392, 1403 (10th Cir. 1992).  Defendants' position is that Plaintiff spoke out only on internal personnel disputes and working conditions, and that such speech does not concern public matters.  Plaintiff implies that she spoke out to expose discrimination and to protect colleagues.  She cites no facts in the argument portion of her brief concerning her First Amendment claim.  Am. Resp. at 39.

Even when the facts are viewed in a light most favorable to her, there is no evidence that Plaintiff ever complained of discrimination in order to protect colleagues.  She complained as an employee about matters related only to her, in contrast with the African-American plaintiff in Patrick v. Miller, 953 F.2d 1240, 1247 (10th Cir. 1992), who spoke out as a citizen against

discriminatory practices taken against co-workers.  See also David v. City and County of

Denver, 101 F.3d 1344, 1356 (10th Cir. 1996).  Accordingly, Defendants' motion for summary

judgment with respect to Plaintiff's First Amendment claim will be granted as to both

Defendants for all forms of relief requested by Plaintiff.

### 2.    Procedural due process

Plaintiff contends that Mr. Barber, the WCA Director who replaced Mr. Kennedy,

violated her rights to procedural due process made actionable under section 1983.  Plaintiff also

contends that any liability under section 1983 must be based on the actions of the individual

actors in this case.  Am. Resp. at 42.  Mr. Barber is not a Defendant in this case.  Accordingly,

Defendants' motion for summary judgment with respect to Plaintiff's procedural due process

claim will be granted as to both Defendants for all forms of relief Plaintiff requests.

### 3.    Substantive due process

Defendants move for summary judgment as to Plaintiff's substantive due process claim

by describing Plaintiff's objections as "purely procedural."  Admittedly, it is unclear from her

Second Amended Complaint how and in what way Plaintiff believes she was deprived of due

process, whether procedural or substantive, although she does use both of those terms.  Plaintiff

testified that she was deprived of "due process" when Mr. Barber personally handled her

complaints by telling her he was tired of her behaving worse than a two-year-old.  Defs' Ex. A at

84-85.[15]  Nevertheless, Plaintiff now claims, or clarifies, in her Amended Response that she had

---

[15] Plaintiff's counsel objected to the deposition question about what Plaintiff claimed was
a due process violation as calling for a legal conclusion.  That objection is overruled since to that
point neither Plaintiff nor her counsel appear to have provided any details as to how Plaintiff was
deprived of substantive or procedural due process.

a property interest in continued employment with the WCA which she lost when she was forced

to resign and that she has a liberty interest in her professional reputation which was damaged by

Crollet's repeated harassment and retaliation.  Defendants ignore these allegations in their

briefing.

It is far from clear whether Plaintiff even has the protected property and liberty interests

which she claims, or if she has them, whether she can pursue them given the fact that Plaintiff

was not fired and that she was able to find another job (a higher paying one, no less).  But I will

not do the parties' legal research for them in this instance and I decline to speculate on Plaintiff's

intentions given the muddled nature of her allegations.  Accordingly, the parties should address

these issues and any other relevant matter with respect to Plaintiff's substantive due process

claim as Plaintiff describes them in her Amended Response at 39-40, in additional briefs

required by this Memorandum Opinion and Order.

### 4.    Equal Protection Clause

Plaintiff in her Second Amended Complaint purports to bring two Equal Protection

Clause claims, one on the basis of sex and another on the basis of race.  Defendants move for

summary judgment as to both.  Unfortunately, the briefing with respect to these claims is of little

value.  Defendants' two sentence argument, which lacks citation to any case law, simply asserts

that "the foregoing amply demonstrates" that Plaintiff was not treated differently than others

based on her sex or race.  Plaintiff's response consists of a discourse on the relationship between

the Equal Protection Clause and section 1983, an assertion that Equal Protection Clause law has

been clearly established since 1988, and citations supporting the proposition that the Equal

Protection Clause protects against dissimilar treatment for classifications other than race or

gender.  This is the identical passage Plaintiff's counsel has cited in another case now pending

before me.  Andazola et al. v. Chaves County et al., No. CIV 00-919 JP/LFG-ACE, Doc. No. 37

(served May 21, 2001).

 To be sure, there in nothing wrong *per se* with recycling legal arguments.  The problem

arises where, as here, the citation to authority is not tailored to the facts.  Defendants are not

asserting qualified immunity and there is no evidence of unconstitutional classifications based on

school district residency or political affiliation.  Plaintiff's discussion of these irrelevant points

of law in this case is thus mystifying.  Plaintiff then concludes by asserting that she has "stated

claims" for violations of the Equal Protection Clause on the basis of sex (no mention of race),

"as set out at length in the preceding pages of this Memorandum."  This statement is virtually

useless to the Court.  But in contrast with Plaintiff's substantive due process claim, further

briefing here would certainly be futile.  I have examined the relevant caselaw, scrutinized the

briefs and the record, and have found that Defendants' motion for summary judgment with

respect to Plaintiff's Equal Protection Clause claim should be granted.

 For Plaintiff's gender-based equal protection claim to proceed, Plaintiff must point to

evidence that she was treated differently than others similarly situated, Tonkovich v. Kansas Bd.

of Regent, 159 F.3d 504, 531 (10th Cir. 1998), not merely "state claims" of dissimilar treatment.

Because her equal protection claim is based on gender, the similarly situated individuals who

allegedly received different, i.e., better, treatment must be men.  Because distinctions based on

gender are considered suspect, they must have an "exceedingly persuasive justification."  United

States v. Virginia, 518 U.S. 515, 531 (1996), or must substantially relate to an important

government interest., id. at 533.

In combing the briefs and the record, the Court has uncovered statements such as Plaintiff's testimony that "[t]he whole time I felt [discriminated against] because of my gender." Defs' Ex. A at 165.  This, of course, is not an example of gender-driven dissimilar treatment.  It is an assertion for which no support or evidence is provided.   So too is Plaintff's testimony that "the Hispanic men" were paid more than her.  Defs' Ex. A at 111.  There are allegations that Crollet treated another woman (Joan Calcutt) more favorably.  Defs' Fact 11 (admitted).  This actually undermines Plaintiff's equal protection gender claim.  The only specific instances in the briefs and the record which the Court has been able to locate concerning allegedly more favorable treatment accorded to males is an allegation about Richard Villafuerte and another regarding men who worked in field offices.  Mr. Villafuerte, who I have assumed was similarly situated to Plaintiff, was not required to take a late lunch, in contrast with Plaintiff.  Defs' Fact 15.  It is undisputed though that the reason for the dissimilar lunch schedules is that Mr. Villafuerte did not speak Spanish.  Am. Resp. at 12 (disputing other facts, without citation). (Plaintiff testified that Spanish-speaking WCA clients who came in near her lunch hour disrupted her lunch schedule, presumably since no one else in the office could take over for her while she went to lunch.  Pl's Ex. A at 54.)  It is also undisputed that the field office employees were paid more because field office positions were more difficult to fill.  Id. at 14 (rephrasing rather than disputing the facts).  I find these justifications exceedingly persuasive and substantially related to an important government interest.  Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's gender-based equal protection clause claim will be granted.  Also, Defendants' motion for summary judgment with respect to any race-based equal protection clause claim will be granted, in accordance with D.N.M. LR-Civ. 7.5(b), because of

14

Plaintiff's failure to respond to Defendants' argument on Plaintiff's race-based claim.

**B.      Title VII and the New Mexico Human Rights Act**

Defendants represent that the analysis with respect to Title VII is equally applicable to Plaintiff's claims under the New Mexico Human Rights Act.  New Mexico courts look to federal law for guidance in applying the Human Rights Act and have adopted the <u>McDonnell Douglas</u> methodology.  <u>Garcia-Montoya v. State Treasurer's Office</u>, 130 N.M. 25, 40, 16 P.3d 1084, 1099 (2001).  But this does not necessarily mean that New Mexico has adopted federal law as its own. <u>Id.</u> (citing <u>Smith v. FDC Corp.</u>, 109 N.M. 514, 517, 787 P.2d 433, 436 (1990)).  Nevertheless, the Court will consider the Title VII analysis equally applicable the New Mexico Human Rights Act analysis, particularly in light of the absence of any mention of the New Mexico Human Rights Act in Plaintiff's brief and Plaintiff's failure to respond to Defendants' assertion that the two bodies of law should be treated as one for purposes of Defendants' motion for summary judgment.

Turning then to Title VII, it appears that Plaintiff intends her lone Title VII count to actually include multiple causes of action.  She claims in her Second Amended Complaint that she suffered discrimination on the basis of her "gender, race, or disability."  Second Am. Compl. ¶ 23.  She also claims retaliation and the existence of a hostile work environment.  At the July 3, 2001 pretrial conference, Plaintiff's counsel denied having pled a disability claim.  Tr. at 4.  In her brief, Plaintiff said she "did not state a claim" based on Plaintiff's disability.  Am. Resp. at 42.  Accordingly, any claim based on an alleged disability will be dismissed.[16]

---

[16] The disability claim alleged in Plaintiff's Second Amended Complaint is frivolous.  It unnecessarily caused Defendants to move for summary judgment as to it and to brief the issue, and it wasted the Court's time.

### 1.     Gender or sex claims

Before filing this case, Plaintiff filed an administrative charge with the New Mexico Human Rights Division.  That administrative charge did not include a claim of sex or gender discrimination.  Consequently, Defendants contend that Plaintiff has failed to exhaust her administrative remedies.  In response, Plaintiff simply states that she has supplemented her administrative to charge to add a claim of sex discrimination.  Indeed, it appears that Plaintiff did so on April 5, 2001, after she initiated this lawsuit and after she filed her Second Amended Complaint.  She offers no other explanation as to why the Court should consider any allegations concerning sex- or gender-related harassment.  Am. Resp. at 11.

The procedure Plaintiff used with respect to any sex discrimination claim turns the administrative process on its head.  An administrative charge is a prerequisite to suit, Martin v. Nannie and the Newborns, Inc., 3 F.3d 1410, 1414 (10th Cir. 1993), not something to be pursued after initiation of a federal lawsuit or in tandem with it.  The purpose of the administrative exhaustion requirement is to encourage voluntary compliance, Cisneros v. ABC Rail Corp., 217 F.3d 1299, 1305 (10th Cir. 2000), not court ordered resolution.  Suing in federal court, then making an administrative claim on the same issue, "makes absolutely no sense and defeats the purpose of the exhaustion requirement altogether." Corbin v. Runyon, 1999 WL 590749, at ** 7 n. 5 (10th Cir. Aug. 6, 1999).

Even if the Court could countenance filing an administrative charge after filing suit in federal court, at the very least, Plaintiff must demonstrate that the administrative process has run its course, i.e., that the Human Rights Division has taken a "final action" or that 180 days have passed since the filing of the charge.  42 U.S.C. § 2000e-16(c).  180 days have not elapsed and

Plaintiff has not shown that the administrative agency has taken any final action.  Accordingly, Plaintiff will not be permitted to pursue, in this case, claims that Defendant discriminated against her on the basis of her sex or gender in violation of Title VII or the New Mexico Human Rights Act.

### 2. National origin disparate treatment

Plaintiff apparently brings a claim that Defendants treated her disparately on the basis of her Hispanic national origin.  Am. Resp. at 36.  Plaintiff seems to contend that she was treated disparately when she was reprimanded for insubordination, threatened with a reprimand, forced to take calls from Spanish-speaking clients, and when she was paid less than Anglo colleagues. Id. at 32.  Plaintiff testified that her national origin claim derives from being required as part of her job duties to speak Spanish to persons contacting the WCA who needed to communicate in the Spanish language.  Defs' Ex. A at 48.  Although Plaintiff did not characterize that as the sole basis for her claim, at the July 3, 2001 pretrial conference, Plaintiff's counsel stated that "[s]he really hangs her race claim" on being required to speak Spanish, when needed, as a part of her job.  Tr. at 15.

To meet her prima facie burden in a case such as this for which there is no direct evidence of discrimination, Plaintiff must demonstrate that she is Hispanic, that she suffered an adverse action, and that similarly situated employees were treated differently.  Trujillo v. University of Colorado Health Sciences Center, 157 F.3d 1211, 1215 (10th Cir. 1998).  If Plaintiff proves her prima facie case, she shifts the burden to Defendants to demonstrate legitimate, non-discriminatory reasons for the adverse actions.  Id.  If Defendants carry their burden, Plaintiff must offer evidence tending to show that Defendants' explanation is pretextual.

17

Id.  Plaintiff relies on Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1090 (5th Cir. 1995),
which she contends stands for the proposition that a plaintiff who has been disciplined on the job
can "state a claim" in a Title VII case if she shows she did not actually violate the rule.

     The issue with respect to the pending motion for summary judgment is, of course, not
whether Plaintiff has stated a claim, but whether she has pointed to evidence sufficient to support
her claim by making the requisite prima facie showing.  Defendant contends that Plaintiff cannot
show any evidence that she has suffered an adverse action.

     The Tenth Circuit liberally defines what constitutes adverse employment actions and
does so on "a case-by-case" basis.  Jeffries v. Kansas, 147 F.3d 1220, 1232 (10th Cir. 1998).
Adverse employment actions are those that work "a significant change in employment status,
such as hiring, firing, failing to promote, reassignment with significantly different
responsibilities, or a decision causing a significant change in benefits."  Sanchez v. Denver Pub.
Schs., 164 F3d 527, 531 (quotations omitted).  They must be more than mere inconveniences.
See id.; Gillum v. Federal Home Loan Bank, 970 F. Supp. 843, 853 (D. Kan. 1997).

### a.      Taking calls from Spanish speakers

     In this case, having to take calls from Spanish-speaking clients is not an adverse
employment action.  While taking these calls may have been difficult for Plaintiff due to her
limited Spanish language skills, it is undisputed that this is a duty for which she volunteered at
least initially.  Defs' Ex. A at 49.  To the extent that she contends it increased her work load, she
testified that she still worked 40 hour weeks.  Id. at 54.  She asserts in her brief that she had to
stay after normal working hours.  Am. Resp. at 12, 18.  She provides no evidentiary citation to
support this assertion.  The only evidence in the record of negative consequences that taking

these calls caused her was having to adjust her lunch schedule.  Defs' Ex. A at 54.  This inconvenience does not rise to the level of a civil rights violation.

For similar reasons, the threat of insubordination for not speaking Spanish when needed to service clients is also not, in this case, an adverse action.  First, the alleged threat never reached the level of an adverse employment action because it was never carried out.  See Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1381 (10th Cir. 1994).  Alternately, that Crollet threatened Plaintiff with insubordination if Plaintiff did not take calls from Spanish speakers resulted simply in Plaintiff taking such calls.  As explained, having to take these calls did not adversely affect Plaintiff.

### b.    WCA chain of command

The other instance of threatened discipline stems from a dispute Plaintiff had with Crollet about WCA policy on bad faith client claims.  Am. Resp. at 34.  Plaintiff alleges that she would have taken this dispute to the WCA Director but for Crollet's threat to charge her with insubordination for failing to follow the chain of command if she did.  Id.  Plaintiff contends that Crollet's threat was "groundless."  Id.  Apparently she means that the principle which the Fifth Circuit described in Mayberry--that she did not violate the rule--extends to instances where the proposed conduct is not actually undertaken and no discipline is actually meted out, and establishes her prima facie case.  Plaintiff is maddeningly silent as to what the rule regarding insubordination is or what the chain of command is, making it very difficult to assess whether taking her dispute to the Director would even have violated a rule or procedure.  However, Plaintiff has pointed to evidence, in the form of an unsworn statement from Mr. Barber, that an insubordination charge for approaching him with a dispute about bad faith claim procedure

would be inappropriate.  Pl's Ex. Q at 79.[17]

Plaintiff offers no insight as to whether the Fifth Circuit's <u>Mayberry</u> rule obviates the need for a Plaintiff to have suffered an adverse employment action to maintain her claim or overcomes the Tenth Circuit's indication in <u>Cole</u> that actions which are never carried out are not adverse.  Defendants do not address <u>Mayberry</u> at all.  Here the alleged adverse action is Plaintiff's inability to approach Mr. Barber about one aspect of WCA operations.  There is no evidence or even any argument that this impediment to speaking with Director Barber about this one subject altered the terms or conditions of Plaintiff's employment and thus amounted to national origin discrimination.

It appears that Plaintiff was actually disciplined or reprimanded in one instance, for seeking legal advice from the WCA General Counsel on the recommendation of one of Crollet's supervisors.[18]  Pl's Ex. M.  Plaintiff does not describe when or how she was reprimanded but asserts that she was disciplined for bypassing the chain of command when she actually followed

---

[17] Page 79 of Exhibit Q is not included with Plaintiff's Amended Response.  Page 79 of Exhibit Q is found attached to her first Response.  Defendants object to Exhibit Q as hearsay. Given that Exhibit Q does not aid Plaintiff's position here, Defendants' evidentiary objection will be denied as moot.

[18] Beginning at the bottom of page 32 of her response, Plaintiff details three instances of alleged discrimination.  The first concerns her chain-of-command claim.  The next two are described respectively as the second and third instances of "threatened" discipline, Am. Resp. at 33-34, calling into question whether the chain-of-command claim resulted in actual, as opposed to threatened, discipline.  Further, the bulk of Plaintiff's allegations concerning the discipline she received for not following the chain of command are not supported by anything more than counsel's assertions.  Am. Resp. at 20, 24, and 33.  And one citation Plaintiff provides, to deposition testimony from Crollet, indicates that Plaintiff was not disciplined.  Am. Resp. at 4 (citing Pl's Ex. D at 44.).  To Defendants' assertion that it is undisputed that Plaintiff was not disciplined, Plaintiff responds without a citation to the record.  Am. Resp. at 13.  Nevertheless, I have assumed that Plaintiff was disciplined or reprimanded for failing to follow the chain of command.

the chain of command.

There are problems concerning this allegation.  Plaintiff has failed to describe the rule regarding the chain of command or outline the chain of command, preventing the Court from examining whether she did or did not violate the rule.  The biggest problem, however, is Plaintiff's failure to show that any discipline or reprimand she received worked a significant change in her employment status.  Instead, she calls the Court's attention to a memo dated May 4, 1999 from Director Kennedy to Crollet, criticizing Crollet's and Plaintiff's handling of their ongoing conflict and indicating that Crollet's "rationale" for disciplining Plaintiff was "difficult to understand."  Plaintiff asserts that her reprimand was not removed from her file, but also that Crollet received a written reprimand on May 7, 1999.  Am. Resp. at 19-20.  Even when viewing these allegations in a light most favorable to Plaintiff, it appears that a rebuke which she received from Crollet was met with a written rebuke to Crollet from Crollet's boss, evening the score in a running feud between Plaintiff and Crollet.  Again, this is not the stuff of which national origin discrimination suits are made.

### c.    Disparate pay

The final allegation of national origin discrimination is that Plaintiff was paid less than Anglo ombudsmen.  It appears from her characterization of her argument on page 34 of her Amended Response and counsel's comments at the July 3, 2001 pretrial conference that this claim is not related to her allegation that she was promised more pay for speaking Spanish.  Again, the argument on both sides is poorly focused and not especially helpful.  Plaintiff does not cite any evidence--not one shred--supporting her allegations about disparate pay.  Nevertheless, Defendants do.  They point to Plaintiff's testimony that an Anglo woman, Kay

Thompson, was paid more.  Am. Br. at 9 (citing Ex. A at 111.)  Plaintiff testified that she was told that people such as Ms. Thompson were paid more because they worked in field offices, for which it was more difficult to recruit.  Id.  In her brief, Plaintiff acknowledges this testimony and implicitly recognizes that it constitutes a legitimate, non-discriminatory reason for disparate pay. Am. Resp. at 34-35.  Apparently as evidence of pretext, Plaintiff asserts that she was "clearly" more qualified than "these Ombudsman" [sic] since she had at one point been temporarily made Acting Bureau Chief.  Id. at 34.  But qualifications are not the issue.  Plaintiff's assertion about her qualifications is no reason to disbelieve the testimony that it was more difficult for the WCA to fill field office positions.  That is, Plaintiff has not shown that Defendants' proffered reason is pretextual or unworthy of belief.

### 3.     Retaliation

To establish a prima facie retaliation case, Plaintiff must show that she engaged in protected conduct, that she was subjected to an adverse action, and that there is a causal connection between the two.  Berry v. Stevinson Chevrolet, 74 F.3d 980, 985 (10th Cir. 1996). Defendants' position is that Plaintiff never suffered an adverse action in response to protected conduct but that if she did, she cannot demonstrate a causal connection between the protected activity and the adverse action.  Plaintiff argues that instances outlined on page 37 of her Amended Response do constitute adverse actions triggered by her protected conduct.  One of these instances is the reprimand Plaintiff received for not following the chain of command.  Two others are the threatened reprimands for not speaking Spanish, when needed, and for disagreeing with Crollet about how to handle bad faith claims.  For reasons already explained, these actions are not adverse within the meaning of Title VII.

Plaintiff also asserts the following:

Further, Ms. Carillo was subjected to a high level of related harassment, including having her job evaluation (PAD) dependent on the outcome of a complaint she had against the WCA, and to verbal ridicule from Mr. Crollet.  Finally, Mr. Crollet threatened that he would have Ms. Carillo terminated.  Each of these constitutes an "adverse action" under Title VII and Tenth Circuit law.

Am. Resp. at 37.  The Court construes this passage as containing three additional examples of retaliation.  While Plaintiff uses language suggesting that this is not an exhaustive list, I decline to speculate just what other actions Plaintiff might believe to be retaliatory.

### a.    PAD

Plaintiff apparently has in mind the PAD Crollet completed in August 1998.  Am. Resp. at 3 (citing Pl's Ex. J, which is undated, representing it was completed in August 1998).  Exhibit J has six "competency" categories.[19]  For four of the six categories, Crollet circled the letter "M" (presumably for "meets expectations or something similar, although no party provides any explanation) or "E" (presumably for "exceeds expectations") and remarked that Plaintiff performed "exceedingly well" in those areas since she had added duties during the period in question and otherwise "she typically meets" these competency categories.  In a fifth category, team work, Crollet gave her an "M" and commented that she worked "cooperatively with others."  In the category titled "personal skills," Plaintiff received an "M" accompanied by the remark that Crollet had declined to give her a rating because she had recently filed a complaint against him but that otherwise she "meets the scope of this competency."

In Meredith v. Beech Aircraft Corp., 18 F.3d 890, 896 (10th Cir.1994), the Tenth Circuit

---

[19]   None of these is an "overall" rating category described in Defendant's Fact 6 which Plaintiff does not dispute.

held that an evaluation that is satisfactory even if lower than previous evaluations is not an

adverse action.  Thus the grievance described in Defendants' Fact 6 would not support a civil

rights claim, even if Plaintiff's initial rating had not been changed in her favor.  However,

Plaintiff's present allegation is somewhat different than that described in Defendants' Fact 6.

She now argues that she received no evaluation at all.  I cannot conclude that a reserved

evaluation score amounts to a negative evaluation.  Moreover, to the extent Crollet evaluated her

anyway, he said she "meets the scope of this competency," i.e., he gave her a satisfactory rating.

Accordingly, summary judgment will be granted as to Plaintiff's claim that she was retaliated

against on her August 1998 PAD.

### b.    Termination threat

Having combed the portions of Plaintiff's brief in which she outlines facts, I have located

two allegations concerning a threat by Crollet to terminate Plaintiff.  One is found on page 24, at

"undisputed fact" d.  Plaintiff does not refer to any portion of the record which would support

undisputed fact d.  I have read the portions of Crollet's and Plaintiff's depositions attached to

Plaintiff's Amended Response and have found an allegation by Plaintiff that Crollet told her

personally that he would do whatever it took to get her fired.  Pl's Ex. A at 62-63.  I will assume

this is the allegation that Plaintiff's counsel had in mind when she drafted the assertions on pages

24 and 37 of Plaintiff's amended response brief and will further assume that it is true.

Crollet never carried out his threat.  Plaintiff does not claim she was fired.  His unrealized

threat is thus not an adverse employment action.  Cole, 43 F.3d at 1381.  In the alternative, the

action which Plaintiff testified actually flowed from this threat--having to do more detailed

writing, Pl's Ex. A at 64--is nothing more than a mere inconvenience and is thus not an adverse

employment action.  <u>Sanchez</u>, 164 F.3d at 531.

A second allegation of threatened termination is found on page 2 of Plaintiff's brief where Plaintiff claims she was threatened with termination for insubordination if she refused to take calls from Spanish speakers.  She cites to a page of her deposition which does not mention that the penalty for refusing to take Spanish calls would be that she would lose her job. Nevertheless, assuming there is support somewhere in the record for her assertion that she was threatened with termination, I find her claim is without merit.  As previously explained, this threat was not carried out and thus is not an adverse action.  As also previously explained, in the alternative, taking Spanish language calls under threat caused her nothing more than mere inconvenience.  Accordingly, summary judgment will be granted as to Plaintiff's allegation that she suffered from retaliation by being threatened with termination.

c.      <b>Verbal ridicule</b>

At page 3 of her brief Plaintiff cites to portions of her deposition testimony in which she described Crollet as "continuously yelling at me."  Pl's Ex. A at 61.  She further testified that "for weeks" Crollet was "screaming at me, telling me to get off the phone . . . accusing me of things, and when I would go into his office to try to discuss it within him, he would tell me to get out."  <u>Id.</u> at 62.  Plaintiff described Crollet as "ranting and raving" and calling her a liar.  <u>Id.</u> at 63.  Asked when this took place, Plaintiff testified, "Anytime I would go in to try to talk to him. . . . he would tell me, 'Just get out,' wave me off."  <u>Id.</u> at 70.  Plaintiff later explained that this behavior began as early as June 1998.  <u>Id.</u> at 71.  In sifting through the record, I have also discovered evidence that although Mr. Kennedy believed Plaintiff required "an inordinate amount of supervision" he felt that Crollet was unnecessarily argumentative and defensive

25

toward Plaintiff.  Pl's Ex. M.

Defendants recognize the allegations Plaintiff makes on page 37.  Reply at 9.  Yet they are selective in those which they actually address and ignore the allegation concerning verbal ridicule.  Once more the Court is left in the awkward position of examining a claim for which the evidence is unclear and about which the parties' argument is useless and indeed virtually nonexistent.

Although not cited by Defendants, some decisions from within the Tenth Circuit have bluntly concluded that "Ridicule . . . does not meet the definition of 'adverse employment action.'"  Caban v. Sedgwick County Sheriff's Dept., 2001 WL 487905, (D. Kan. April 19, 2001).  But what Plaintiff seems to call ridicule is more accurately described as hostility.  Co-worker "hostility or retaliatory harassment" may constitute an adverse action, Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264 (10th Cir. 1998), so certainly hostility directly from a supervisor may too.  This alleged hostility effectively cut Plaintiff off from communicating with her immediate supervisor.  If true, this would be more than a mere inconvenience and would alter the conditions of Plaintiff's employment.  Thus, it is an adverse action.

In their opening brief, Defendants make the blanket assertion, without any citation to relevant case law or application to the facts, that Plaintiff never demonstrates a causal connection between protected conduct and an adverse action, the third and final element of her prima facie case.  Am. Br. at 17.  Plaintiff describes the following as evidence to support an inference that there is a causal connection between protected conduct and an adverse action:  Crollet's comment on her August 1998 PAD; his statement that he would do whatever it took to get her terminated; and testimony from Ms. Pena-Johnson that Crollet was targeting Plaintiff.

Defendant in reply does not address this evidence of a causal connection.

Having once again been left in the unfortunate but now-familiar position of having unhelpful briefing, I find that Plaintiff has shown a causal connection between protected conduct and behavior by Crollet affecting the conditions of her employment.  The August 1998 PAD demonstrates that Crollet was at least concerned about Plaintiff's protected conduct.  This gives rise to an inference that Crollet's tirades and exclusion of Plaintiff could be caused by intent to retaliate.  A plaintiff is also entitled to an inference of causation when the action which adversely affects her follows close in time to the protected conduct.  O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1252 (10th Cir. 2001).  No party makes any argument about a temporal relationship.  But, as Defendants point out, Plaintiff engaged in protected conduct since even before Crollet was hired, including filing a complaint about the qualifications for the position Crollet eventually obtained.  Similar protected conduct continued until just a few months before Plaintiff left.  Thus, no matter when Crollet began to rant and rave, Plaintiff would be entitled to a temporal causal inference.  Accordingly, Defendant's motion for summary judgment as to Plaintiff's retaliation claim arising out of Crollet's "ridicule" of Plaintiff, i.e., yelling at her and keeping her away, will be denied.

## C.      Hostile work environment

In response to Defendants' motion for summary judgment, Plaintiff asserts that she "states claims" for a hostile work environment "on the basis of sex and national origin, as well as retaliation."  Am. Resp. at 27.

### 1.      Sex

I have already found that Plaintiff has not demonstrated that she satisfied Title VII's

administrative prerequisites with respect to sex discrimination and thus cannot pursue that claim
in this case.

### 2.      Retaliation

I have also already found that several of the ways which Plaintiff claims she was
retaliated against did not rise to the level of an adverse action and thus could not be further
pursued.  I also found that Plaintiff has shown one adverse action which could be the result of
intentional retaliatory action.  It is unclear whether, in light of these determinations, she can
pursue a separate claim for "hostile work environment . . . on the basis of . . .  retaliation."  Am.
Resp. at 27.  Defendants do not address this contention at all.  And no party cites any case in
which a court has explicitly recognized a hostile work environment retaliation claim that is
somehow distinct from that which Plaintiff describes at page 35 of her brief.  My preliminary
research reveals a split of authority as to whether a cause of action for a hostile work
environment based on retaliation even exists.  Compare Downs v. Postmaster General, 1999 WL
777668, at **2 (6th Cir. Sept. 17, 1999) ("Downs failed to state a claim for a hostile work
environment because he specifically alleged that Cole's purported harassment was not due to
race, but was out of retaliation for his prior EEO activity.") with Perez v. Brown, 1999 WL
33289707, at * 7 (W.D. Tex. 1999) (not finding such a cause of action in the Fifth Circuit, but
that if it existed, it failed on its merits); see also Burlington Industries, Inc. v. Ellerth, 524 U.S.
742, 753-54 (1998) (suggesting that hostile work environment claim matures into a claim based
on "a tangible employment action" and that the two varieties of discrimination are exclusive of
one another).  Accordingly, I would like the parties to address the question of whether in the
Tenth Circuit there is a Title VII cause of action for a hostile work environment based on

retaliation that is distinct from that retaliation claim which Plaintiff describes beginning on page

35 of her brief, and if so, whether she can pursue such a claim in addition to the retaliation claim

she has with respect to Crollet's "ridicule" of her.

### 3.   Race

> For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998) (quotation

omitted). The severity and pervasiveness of the conduct must be judged from a subjective and

an objective perspective. Harris v. Forklift Syss., 510 U.S. 17, 21 (1993). This assessment is to

be made in light of the record as a whole, in the context of the totality of the circumstances.

Penry, 155 F.3d at 1262. Facially neutral abusive conduct can support a finding of intent, but

there must be some evidence of racial enmity. Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir.

1994). In Bolden for example, the Tenth Circuit examined the work environment of an African-

American employee who had been the target of two racial remarks and one arguably racial

comment. Id. at 548, 551. These were not sufficient to be actionable, even in light of the

general workshop ridicule which became prevalent two years later. Id. at 551.

In the argument portion of her brief, Plaintiff does not call attention to a single incident

that could even be considered overtly racial. Having studied the remainder of her brief as well as

the record, I have found only a single instance of conduct implicating race, namely, that Plaintiff

was forced to take calls from Spanish speaking clients. There are a number of problems

concerning this claim.

First, there is a question as to whether forcing Plaintiff to take calls in Spanish is even a racial act.  Certainly, requiring Plaintiff to speak Spanish is not akin to sending a racial epithet her way, as was the case in <u>Bolden</u>.

Second, there is a question as to whether forcing Plaintiff to take calls in Spanish is on its face a racially-motivated act.  A look at the surrounding circumstances brings this question into sharper focus.  Defendants state, and Plaintiff does not dispute, that Mr. Villafuerte, a Hispanic, was not asked to take Spanish speaking calls.  It is undisputed that this is so for the simple and logical reason that he did not speak Spanish.  Plaintiff is able to speak Spanish.  But it appears that she was told to take calls in Spanish simply because she could speak the language, not because of her ethnicity.

Third, there is a question as to whether Plaintiff herself believed that being required to take calls in Spanish was discriminatory since she initially had volunteered to do that.  Thus, this action may not even have been subjectively considered as contributing to a racially hostile working environment.

Nevertheless, Plaintiff testified that she felt discriminated against once she no longer felt like a volunteer.  But, like the three overtly racial acts in <u>Bolden</u>, the lone allegedly racially based act in this case does not give rise to a pervasive or severe racially hostile work environment.  This is true even if requiring Plaintiff to take Spanish language calls was a racially hostile act motivated solely by Plaintiff's race or ethnicity.  <u>Bolden</u>, 43 F.3d at 551.  The Court must also look to the workplace environment as a whole or the totality of the circumstances.

The totality of the circumstances of Plaintiff's workplace environment only further undermines Plaintiff's claim.  Plaintiff testified that Crollet on at least one occasion gave Joan

Calcutt, who is Hispanic, a "basketful of stuff" and threw birthday parties for her.  Am. Resp.

Ex. A at 125; <u>see also</u> Defs' Fact 11.  She further testified that Crollet would talk to "everyone

else," meaning Ms. Maldonado (who also took calls in Spanish and is Hispanic), Mr. Villafuerte,

and Ms. Calcutt.  <u>Id.</u> at 126.  And of course, Crollet himself is Hispanic.  Yes, there is evidence

Crollet treated Plaintiff in an immature and unprofessional manner, and it is certainly possible

that his Hispanic identity would not preclude him from discriminating against Hispanics.  But no

rational jury could find, under the totality of these circumstances, that any hostility in Plaintiff's

work environment was due to her race or ethnicity.  And Title VII is not a general code of

workplace civility.  <u>Gunnell</u>, 152 F.3d at 1265.  Accordingly, Defendants' motion for summary

judgment with respect to this claim will be granted.

   IT IS THEREFORE ORDERED THAT

1. Defendants' motion to strike is denied,

2. Plaintiff's motion to exceed the page limit for her response brief is granted,

3. Defendants' motion for summary judgment is granted with respect to Plaintiff's claim

that Defendants breached a contract with her,

4. Defendants' motion for summary judgment is granted with respect to Plaintiff's claims

for damages against the WCA and Defendant Crollet in his official capacity for violations of the

United States Constitution, but a ruling on Defendants' motion for summary judgment as it

relates Plaintiff's substantive due process claim is deferred until after further briefing,

5. Defendants' motion for summary judgment is granted with respect to Plaintiff's claims

against all Defendants for all forms of relief for violations of Plaintiff's rights to speak freely, to

equal protection of the laws, and to procedural due process, guaranteed under the United States

Constitution,

6.     Defendants' motion for summary judgment is granted with respect to Plaintiff's claim that Defendants discriminated against her or created a hostile work environment on the basis of Plaintiff's gender or sex, race or national origin, and disability, under Title VII and the New Mexico Human Rights Act,

7.     Defendants' motion for summary judgment is denied with respect to Plaintiff's claim that Defendant retaliated against her by subjecting her to "verbal ridicule" as alleged on page 37 of Plaintiff's Amended Response, and

8.     Defendants motion for summary judgment is granted as to Plaintiff's remaining retaliation claims as alleged on page 37 of Plaintiff's Amended Response.

        IT IS FURTHER ORDERED THAT the parties must file cross-briefs with respect to Plaintiff's substantive due process claims and Plaintiff's claim that her work environment was hostile because of retaliation by not later than August 10, 2001, and that if Plaintiff does not intend to pursue the claims about which further briefing has been ordered, she must advise the Court and opposing counsel in writing immediately.

_____

**CHIEF UNITED STATES DISTRICT JUDGE**